THE STATE OF WASHINGTON, *Respondent*, v. BOBBY WHITE, *Appellant*.*

*Roller, Barker & Turco* and *Ralph G. Turco*, for appellant (appointed counsel for appeal).

*Ronald L. Hendry, Don R. Smith*, and *Grant L. Anderson*, for respondent.

HALE, J.—On hearing from her 8-year-old daughter that 4 days earlier her husband had attempted sexual relations with the child, Mrs. White, without awaiting due process, executed a sentence instanter. It was the morning of December 13, 1965, and Bobby White, the defendant, lay asleep face down in the bedroom. Mrs. White carried a large pan of boiling water into the bedroom, pulled back the bed covers and poured the scalding water over her

*Reported in 433 P.2d 682.

husband from his buttocks to his shoulders. She then called the police who took the child and Mrs. White to Mountain View General Hospital. Somehow or other—the record does not specify—Bobby White reached Tacoma General Hospital by 11 a.m. His doctor, who on an earlier occasion had treated him for an industrial injury, saw him at 12:30 p.m.

Conflicting medical findings, although providing sufficient evidence to support the verdict of guilty, nevertheless, made a rather close case of it. At Mountain View Hospital, Dr. Thelma Myhre found the child to be suffering from a vaginitis with post-vaginal discharge, which the doctor attributed to gonorrhea. The doctor found also that the child's hymen was not intact, but could find no evidence of bruising or tearing or abrasions in or around the vaginal area such as would normally be produced by sexual intercourse between an adult male and an 8-year-old child. The doctor found no evidence of sperm in or about the vaginal area. Thus, except for the gonorrheal infection and unintact hymen, there was no medical evidence of sexual intercourse or assault.

Dr. Myhre said that she could draw no conclusion of sexual intercourse from the unintact hymen because there could be other causes for it. In other words, the unintact hymen would not be a conclusive finding establishing sexual relations. The doctor also testified that a child could become infected with gonorrhea through contact with contaminated materials such as washcloths or bath cloths.

At Tacoma General Hospital, Dr. Daniel Thomas, a specialist in diagnosis and surgery thoroughly examined the defendant. He found burns on the abdomen, buttocks and genitals but observed no purulent discharge from or around the genitals. A urinalysis showed a pus reading of 1 plus on a scale of 4—a finding inconsistent with defendant's having had infectious gonorrhea 4 days earlier, but entirely consistent with the severe burns caused by the boiling water. Dr. Thomas testified that, although gonorrhea is most commonly transmitted through sexual intercourse, infrequently it is transmitted to young people through contaminated

clothes, instruments, toilet seats, towels and bed linen. He said the recommended method of controlling the disease among young children is to isolate the infected child from school for it could spread rapidly among school children by means of contaminated articles.

As of December 13th, the day of the first examination, and in the course of treating the defendant for burns, Dr. Thomas found no clinical evidence or symptoms of gonorrhea; he said that, had the disease been present, it would readily have been apparent to him as a treating physician. He said that he gave the defendant an average amount of antibiotic for the burns, and had the defendant been infected this would have cleared up any gonorrhea. Asked about the possibility of sexual intercourse between a man and a child, he said the absence of a hymen in an 8-year-old child did not necessarily indicate sexual intercourse, and that he would expect to find tearing and lacerations had it occurred.

Dr. Karel Pokorny, a physician specializing in public health called by the state, testified that among his routine duties as a county health officer was the examination and treatment of persons having venereal disease. From medical records shown him, he said there was no evidence that either Bobby White or the child's mother had gonorrhea. In his opinion, the disease is transmitted only through sexual intercourse; he did not believe that it spread by other means. Dr. Pokorny testified that tearing or laceration or bruising would result from sexual intercourse between an adult male and an 8-year-old girl, and that a ruptured hymen in an 8-year-old girl did not necessarily mean sexual intercourse.

The child, called as a witness by the state, described a series of acts committed by the defendant which would constitute sexual intercourse, including a penetration. She testified also of enduring some pain. She said the acts took place when her mother was away and the defendant home alone with her.

Charged by information, and found guilty by a jury of the crime of carnal knowledge, the defendant, denying completely the accusations, now appeals the judgment and sentence of life imprisonment entered on the verdict. He testified that he had done none of the things described by the child, and that his wife's actions in scalding him had been precipitated by her suspicions of his infidelity. He further testified that once before, accusing him of infidelity, she had hit him alongside the head with an iron skillet; another time she had cut him on the hand with a razor when, in her estimation, he had spanked the child too hard; he testified that once he had come home late from work and she accused him of being with another woman. He said that while he was taking a bath, she came in and stabbed him in the back with a butcher knife and, once "she throwed a bowl of hot coffee on my chest."

The wife's accusations of infidelity seem to be well-founded for the defendant called a witness to establish that he did not have gonorrhea during a relevant time. This witness testified that she was employed at the same place as the defendant. She said that she had had sexual intercourse with the defendant twice—once in November and again early in December, 1965. On neither occasion, she said, were any precautions taken to prevent contracting a venereal disease; and she did not on either occasion contract or have a venereal disease thereafter.

As we have earlier observed, although proof of guilt was not strong, it was sufficient to support the verdict of guilty. The first assignment of error to be considered concerns delay in bringing the defendant before a judicial officer after his arrest. Defendant had been taken to the hospital December 13, 1965; the next day he was charged by complaint with the crime of carnal knowledge; December 28, 1965, he was transferred from Tacoma General Hospital to Mountain View Hospital with a police hold on him. January 4, 1966, on release from Mountain View Hospital, the police took him to the city jail and from there, on January 14, to the county jail. Three days later, January 17, 1966, he

was first taken before a magistrate on a justice court complaint for explanation of his constitutional rights, appointment of counsel and the fixing of time for preliminary hearing.

December 28, 1965, the prosecuting attorney filed the instant information, superseding a justice court complaint. Defendant challenges the 13-day delay between his transfer to the city jail from the hospital January 4, 1966, to appointment of counsel January 17th, as a deprivation of counsel and prejudicing him through loss of a material witness who could establish an alibi. He accordingly moved for a dismissal on the grounds of prejudicial delay in the arraignment and appointment of counsel.

▮ Defendant failed to establish any prejudice to his defense arising from the delay in arraignment or appointment of counsel. Although suggesting that it prevented his locating an alibi witness (one A. S.), he did not make an offer to prove what the witness's testimony would be, or even that the witness could not have been located by time of trial; nor was the court's aid sought in issuing compulsory process for the attendance of the witness.

In his own testimony, the defendant asserted no alibi but steadfastly denied committing any of the acts charged or of making any indecent advances whatever toward the child, and insisted that the prosecutrix lied in her accusation. When asked on cross-examination about A. S., the very witness he now claims would support an alibi, he testified merely that she was a friend at whose home he had held his assignation with the other witness called by him to establish that he did not have gonorrhea. Thus, several times when the asserted alibi witness's name came into his examination, despite his opportunity to do so, he did not suggest that he was at the witness's home on the evening the acts charged took place. The delay in arraignment and appointment of counsel not being shown to have prejudiced the defendant in the preparation of his defense, the motion to dismiss was properly denied. *State v. Roberts,* 69 Wn. 2d 921, 421 P.2d 1014 (1966).

The main ground upon which a reversal is urged concerns the admission in evidence of certain hospital and medical records containing hearsay statements. These, admitted over objections and requests to expunge, consisted of hospital, doctor and nurses' records from Mountain View Hospital pertaining to the 8-year-old prosecutrix. Page 1 of the emergency and dressing room report (plaintiff's exhibit 1) contained identifying information as to the child's name, age, residence and the name of her mother. On the line reserved for diagnosis, the doctor had written "Alleged rape." On page 3, a pink sheet denominated "Physician's Progress Record," in the doctor's handwriting was the following:

> An 8 y.o. negro girl brought in by mother & police woman . . . alleged rape by step-father on 12-9-65, sometime in the evening. The young girl gives a logical, concise history of the following events. The child states that she & her step-father were alone . . . that nite (the mother works) when he began feeling her thighs & ext. genitalia. He then took the child into his bedroom, laid her on the bed, took off her clothes and laid on top of her. Next she says that "he put his weannie inside me & it hurt me." The child complained of discharge & difficulty urinating today & then related the above events to her. The police were informed & the pt. brought to MVGH.

Testimony of the young prosecutrix corroborated this hospital record when she gave the jury a detailed account of defendant's actions toward her—a recital which, if believed by the jury, would sustain a verdict of guilty to the charge of carnal knowledge.

The learned trial judge admitted the hospital records in evidence under the Uniform Business Records as Evidence Act (RCW 5.45.020), an enactment designed to permit the introduction of regularly maintained records and accounts of acts, conditions and events existing or taking place contemporaneously with the making of the record. *Young v. Liddington*, 50 Wn.2d 78, 309 P.2d 761 (1957); *Benjamin v. Havens, Inc.*, 60 Wn.2d 196, 373 P.2d

109 (1962). Although the Uniform Business Records as Evidence Act allows regularly kept business records in evidence when proof that their custody, control and making shows prima facie that they are maintained in the regular course of business, the statute ipso facto does not render admissible such parts of the records as are otherwise excludable under well-established rules of evidence. If regularly maintained under a prearranged and established scheme, business records may be admitted to show the occurrence of events, conditions, conduct and status of things existing or occurring contemporaneously with the making of the records, but they are not admissible as a narrative of occurrences antedating the making of the notations. In short, although the Uniform Business Records as Evidence Act establishes a statutory exception to the common-law rule against hearsay evidence, it does not in all respects render admissible evidence contained in the records which should ordinarily be excluded. See Luvera, Jr., *Demonstrative Evidence Problems in a Personal Injury Case*, 2 Gonzaga L. Rev. 77, 85 (1967); *Benjamin v. Havens, Inc., supra.* The courts, in deciding what parts, if any, of the records offered shall be expunged, must analyze the probable effects of the hearsay. If the proof of the facts in issue is great and the hearsay merely cumulative and so incorporated into and interspersed with the records that its removal will substantially mutilate the records or deprive them of integrity and continuity, the admission may be considered nondamaging and the court may, rather than effectually destroy valuable evidence, receive the records in evidence.

If, however, the hearsay contents goes to the heart of an issue on trial so that when believed by a jury it could logically be regarded as proof of the affirmative or negative of an issue, the hearsay should be rejected or expunged, even if in doing so the records must necessarily be mutilated or rendered incoherent.

It follows, of course, that not all hearsay evidence contained in records received under the Uniform Business Rec-

ords as Evidence Act is grounds for reversal, even though admitted in error, for the concept of harmless error remains with the courts. A judicial system which treats every error as a basis for reversal simply could not function because, although the courts can assure a fair trial, they cannot guarantee a perfect one. Thus, error without prejudice is not reversible. *Capen v. Wester,* 58 Wn.2d 900, 365 P.2d 326 (1961). Expressed differently, error which does not substantially affect the merits of the controversy likewise is not grounds for reversal. *W. L. Reid Co. v. M-B Contracting Co.,* 46 Wn.2d 784, 285 P.2d 121 (1955).

But we are unable to classify the hearsay evidence contained in these hospital records as harmless or inconsequential error. The hearsay statements standing alone constituted potent proof of guilt when accepted as true by the jury. An examination of the hospital records admitted over objection reveals that they contained detailed hearsay statements describing criminal acts of carnal knowledge committed by the defendant upon his 8-year-old stepdaughter on or about the date charged in the information. The hospital records, if believed, thus established affirmatively all of the issues of fact raised by the information and permitted the defendant's conviction, if accepted by the jury, on hearsay evidence. So damaging was the hearsay evidence, going as it did to the heart of the issues on trial, that we must rule its admission to constitute reversible error.

Reversed and a new trial ordered.

DONWORTH, WEAVER, and HUNTER, JJ., and BARNETT, J. Pro Tem., concur.